UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

LISA QUARLES                                          DOCKET NO.: CV-22-213

                        Plaintiff,
                                                      **COMPLAINT**

            -*against*-


NEW YORK CITY HEALTH AND HOSPITALS ,
JONATHAN WANGEL, in his individual and official
capacities and ANDREA COHEN, in her individual and
official capacities,                                  ***JURY TRIAL IS DEMANDED***

                        Defendants.
-------------------------------------------------------------------- X

Plaintiff LISA QUARLES, by and through her attorneys, the LAW OFFICES OF

FREDERICK K. BREWINGTON, as and for his Complaint, against the Defendants NEW YORK

CITY HEALTH AND HOSPITALS, JONATHAN WANGEL and ANDREA COHEN states and

asserts the following:

## PRELIMINARY STATEMENT

1.      This is a civil action seeking monetary relief (including past and on going economic

loss), compensatory and punitive damages, disbursements, costs and fees for violations of the

Plaintiff's rights, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

et seq. (as amended), 42 U.S.C. §§1981, 1983, and 1988, New York State's Human Rights Law,

Executive Law Art. 15, 296 of the Human Rights Law, Title 8 of the Administrative Code of the City

of New York, New York City Human Rights Law.

2.      Specifically, the Plaintiff alleges that the Defendants engaged in discrimination and

retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did

wrongfully deprive Plaintiff of the appropriate employment position and title and pay through acts

that were taken against Plaintiff because of her race, color, and gender, and opposing discrimination. These acts resulted in misrepresentation, misinformation, negative impact regarding Plaintiff, humiliation, embarrassment, depravation of job opportunities, loss of income and retirement benefits, permanent injury and harm and other results which continue to mount.

3.      Specifically, the Plaintiff alleges that the collective Defendants engaged in discrimination and retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of the appropriate employment position and title and pay through acts that were taken against Plaintiff because of her race, color, and sex, and opposing discrimination. These acts resulted in misrepresentation, misinformation, harassment, character assassination, negative impact regarding Plaintiff's employment title, position and salary, humiliation, embarrassment, depravation of job opportunities, permanent injury and harm and other results which continue to mount.

4.      Plaintiff alleges that the collective Defendants, directly acted and/or allowed its agents, employees, representatives and/or officers to act maliciously and unconstitutionally, enacting discriminatory policies, which caused Plaintiff to suffer the following injuries:

- •      Violations of her various statutory rights, including those protected by Title VII of the Civil Rights Act of 1964, Article 15 of the Executive Law of the State of New York (Human Rights Law) §§ 290 and 296, New York County Human Rights Law, Title 8

- •      Violations of her Constitutional rights under the Fourteenth Amendment to the United States Constitution (Fourteenth Amendment) in violation of 42 U.S.C. § 1983, and violations of 42 U.S.C. § 1981;

- •      Complete, temporary, or partial loss of reputation;

- •      Loss of benefits, pay, and future income;

• Prolonged alteration of employment and/or temporary/partial alteration of employment opportunities; and

• Diminished capacity, incurring special, monetary, and compensatory damages.

5. Said acts were done knowingly with the consent and condonation of NEW YORK CITY HEALTH AND HOSPITALS CENTER (hereinafter "HHC"), JONATHAN WANGEL, in his individual and in his official capacity, ANDREA COHEN, in her individual and in her official capacity, with the express purpose of targeting, injuring and silencing the Plaintiff, and generally violating her rights as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

## JURISDICTION AND VENUE

6. The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

7. The Court is requested to exercise pendant jurisdiction with respect to Plaintiff's State law claims pursuant to 28 U.S.C.§ 1367.

8. Venue in the Eastern District of New York is proper under 28 U.S.C. §1391, based on the fact that Plaintiff resides in Queens County, New York and the Defendants are conducting business in the State of New York.

9. On February 9, 2021 Respondent dual filed her Complaint with New York State Division of Human Rights under case number 10210860, and the United States Equal Employment Opportunity Commission under charge number 16G-2021-01018 charging the within Defendants with discrimination based upon Plaintiff's race, color and sex in violation of N.Y. Executive Law Article 15.

10.     On October 15, 2021, Plaintiff received a Notice of Right to Sue Within 90 Days, issued by the U.S. Department of Justice with regard to EEOC Charge No. 16G-2021-01018.  As of the filing of this complaint, ninety days from the date of receipt of the Notice of Right to Sue has not yet passed.

## PARTIES

11.     Plaintiff, LISA QUARLES (hereinafter "Plaintiff" or "Ms. QUARLES"), at all times relevant in the Complaint, is an African American woman with brown skin and is a citizen of the United States of America.  Plaintiff is employed by HHC in Lincoln Hospital, and currently holds the position of Labor Relations Specialist. Plaintiff resides in the County of Queens, State of New York.

12.     During all times relevant to this Complaint Defendant HHC was and is a Corporation within the State of New York.  Upon information and belief, HHC oversees, maintains, manages/supervises, and controls several departments, agencies and employees, including but not limited to, all of the public hospitals and clinics in New York City, JONATHAN WANGEL and ANDREA SAWYER.  HHC is an employer within the definition of the New York State Executive Law, Title VII, and employs well over 15 employees.

13.     DEFENDANT, JONATHAN WANGEL (hereinafter Mr. WANGEL), is the Deputy Counsel and Assistant Vice President of Labor Relations for HHC and is sued in his individual and official capacity, and was at all times herein mentioned supervising members of HHC, and was employed by HHC under the direction of Defendants, HHC and COHEN.  Mr. WANGEL was at all times relevant to this complaint acting in furtherance of the scope of his employment.

14.    DEFENDANT, ANDREA COHEN, is the Head of Labor Relations for HHC and is sued in her individual and official capacity, and was at all times herein mentioned supervising members of HHC, and was  employed by HHC under the direction of Defendant, HHC.  Ms. COHEN was at all times relevant to this complaint acting in furtherance of the scope of her employment.

## FACTUAL ALLEGATIONS

15.    Mrs. Quarles applied for the position of Director of Labor Relations after previously serving in the healthcare labor relations field fo more than twenty five years.

16.    Her experiences included being a Director of Labor Relations at Bronx Lebanon Hospital and Beth Abraham Nursing Home.  Ms. Quarles is also experienced representing each side of the aggrieved parties in these labor disputes having represented both unions and facilities.

17.    When Ms. Quarles was hired, she was told that there were currently no Director positions open.  She was told that HHC would welcome her as a Labor Relations Specialist, which is a position beneath Director in title, salary and prestige, and then promised the opportunity to become Director because there would certainly be future openings.

18.    At the time. Ms. Quarles welcomed the opportunity to work with an organization like HHC and took them at their word.  Ms. Quarles fully expected to spend a short amount of time as a Labor Relations Specialist and then become the Labor Relations Director of one of HHC's hospitals.  However, that promise has yet to be kept.

19.    After four months on the job  as a Labor Relations Specialist, and for the remainder of 2019, Ms. Quarles began applying for several Director positions which she believed were open and available to her.

5

20.    The interviews she was granted seemed pretextual as she was asked questions like, "Would you accept a Director's position at a different location?" Ms. Quarles did not receive her promised promotion and has still not received the promotion.

21.    In fact, when HHC lists their thirteen facilities and the corresponding Directors of Labor Relations, all of the facilities except two have the names of Directors, Queens and Lincoln. Ms. Quarles is the lone Labor Relation Specialist working at Lincoln Hospital handling all of its union grievances against HHC, disciplinary actions HHC imitates against employees, including investigation and mediation, drafting reports, assisting HHC attorneys and more. According to Defendants, this is a description of the job duties and responsibilities of a Director of Labor Relations. MS. Quarles is successfully in this role daily.

22.    Ms. Quarles has been put into a role where she serves as a Director, with all of the responsibilities but without the title, pay and benefits. On one hand, Defendants trust Ms. Quarles in this capacity, yet then claim that she is not proficient enough at her job to become a titled Director.

23.    While HHC claims there is no racial discrimination and points to the total number of Black employees at HHC, they continue to omit that since hiring Ms. Quarles she has been bypassed for promotion by Caucasian applicants from outside of HHC.

24.    The actions and inactions of New York City Health and Hospitals Corporation directed against Ms. QUARLES documented within this Complaint more than establish a prima facie case of discrimination on the basis of race, color, and/or national origin. The factual circumstances in this matter, at minimum, support a finding of discriminatory employment practices carried out by HHC against Ms. QUARLES.

25.     HHC undoubtedly lacks any legitimate, non-discriminatory reasons for the differential treatment failure to promote Ms. QUARLES in this case, including but not limited to, the failure to even interview, forcing Ms. Quarles to work out of title as A Labor Relations Specialist with the responsibilities of a Director at a fraction of the pay, forcing Ms. Quarles into remedial training courses with no end or room for improvement, failure to promote Ms. Quarles to a Director position and instead promote less qualified Caucasian applicants JJ Blitstein, Fred Garrity, and Samantha Kent.

26.     Ms. Quarles experienced and continues to experience disparate treatment and a discriminatory pattern of behavior displayed in her place of employment by Defendants.

27.     The discrimination asserted by Ms. Quarles is prohibited under Title VII of the Civil Rights Act of 1964 ("Title VII") and Article 15 §296 of The New York State Executive Law (§296). Title VII and § 296 make it unlawful for an employer to subject an employee to unequal terms and conditions of employment based upon race.  Furthermore, Title VII and §296 make it unlawful for those participating in discriminatory practices to retaliate against anyone who opposes such discriminatory practice.  See New York State Executive Law, Section 296.

28.     Complainant's assertions of facts and information pertaining to the promotions denied to Ms. Quarles because of the discriminatory practices of Defendants based upon race, color and national origin and given to Fred Garrity, JJ Blitstein, and Samantha Kent are provided as necessary comparators for evaluation by this Court.  These references are permissible under State and Federal Law to provide historical information as evidence of the clear discrimination, as well as the pattern and practice of discrimination by Defendants HHC.

29.     It is imperative that this Court contrast the treatment of JJ Blitstein, Fred Garrity, and

Samantha Kent by HHC with the treatment received by Ms. Lisa Quarles.  This contrast is well recognized as the proper method of evaluation which must be made in order for this Court to more clearly see the totality of circumstances resulting in an ongoing pattern of Defendant's discrimination against Ms. Quarles solely based upon her perceived race, color, and/or national origin. *Abu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467-8 (2d Cir. 2001) (concluding that a common and effective way of establishing an inference of discriminatory intent is showing disparate treatment).

30.     In the instant Complaint, Ms. Quarles offers facts which demonstrate disparate treatment occurred through behavior which continually denies Ms. Quarles promotions to positions given to Caucasian employees with lesser qualifications than Ms. Quarles.  As demonstrated, Defendants have painted an incomplete picture with respect to the criteria used to promote and pay Caucasian employees of HHC, while systematically and simultaneously denying Ms. Quarles promotions by tailoring each denial to a pretextual strength of the preferred Caucasian recipient.

31.     In response to Ms. Quarles' charge of discrimination, Defendants make pointed conclusory responses utilizing both incomplete and totally false self serving allegations regarding the qualifications used to measure potential candidates for promotion within HHC.

32.     Defendant HHC's contention that Ms. Quarles' claim of discrimination as meritless is contrary to the actual facts of this case.

33.     In February 2019, Ms. Quarles was hired by Defendant HHC to work as a Labor Relations Specialist.  Unbeknownst to Ms. Quarles, the racial discrimination and harassment began upon her hire by Defendants, and continues today.

34.     In January 2019, Ms. Quarles, an African American woman who applied for, and was at the time qualified for, the position of Director of Labor Relations, was hired as a Labor Relations

Specialist.  She began her role as Labor Relations Specialist on February 11, 2019 at a salary of

$85,000.  At the time of hire, Ms. Quarles was told that she would have the opportunity to apply for

a Director of Labor Relations position sometime in the future because there were "always openings"

for Directors.  While the statement of constant openings as a Director may have been true, the

representation that Ms. Quarles would be fairly considered for such position was not.  As evidenced

by the Affidavits of two female non-Caucasian former employees who left HHC because of their

discriminatory practices, HHC had no intention of providing Ms. Quarles with the position or salary

to which she was qualified.

35.     Of particular note is the testimony of Ms. Quarles former immediate supervisor

Michelle Kelly, whom Defendants desperately attempt to frame as someone hyper critical of Ms.

Quarles.  Ms. Kelly testified, among other issues with HHC, that:

> " 9.     Lisa Quarles was hired as a Labor Relations Specialist to assist me at Lincoln Hospital on or about February 2019.
> 10.     Upon review of Ms. Quarles resume, I inquired of Matthew Campese, the then Vice President of Legal Relations and Michelle McCarthy, the then Deputy Director of Labor Relations as to why Ms. Quarles was hired as a Labor Relations Specialist and not a Director of Labor Relations.  Based upon her resume, it was obvious that Ms. Quarles was more than qualified for the position of Director of Labor Relations.
> 11.     The response I received was that Ms. Quarles did not want to be a Director of Labor Relations because she was at the end of her career and did not want to take on such responsibilities and preferred the role of Specialist.
> 12.     It was not until approximately one year later that I learned that Ms. Quarles' initial application was for the position of Director and she never stated that she only wanted the position of Specialist.
> 13.     When Ms. Quarles applied for a Director's position at Central Office Labor Relations, I asked Ms. Quarles why she wanted to leave.  It was then that I learned that not only did Ms. Quarles want to be a Director, but that she initially applied to be a Director and was promised an opportunity at a later time when there were other openings."

36.     The testimony of Ms. Heeral Mody also addresses this incident and states in pertinent part:

> "11.     Additionally, I was in the room during the meeting with Matthew Campese, the then Vice President of Legal Relations and Michelle McCarthy, the then Deputy Director of Labor Relations and Michelle Kelly, the then Director of Labor Relations at Harlem and Lincoln Hospitals when Ms. Kelly asked why Ms. Quarles was hired as a Labor Relations Specialist and not a Director of Labor Relations.  Based upon her resume, it was obvious that Ms. Quarles was more than qualified for the position of Director of Labor Relations.
> 12.     I heard the response that Ms. Quarles did not want to be a Director of Labor Relations and preferred the role of Specialist.  They said she was at the end of her career and did not want that kind of responsibility.
> 13.     That of course was not true and was said in an attempt to prevent the growing realization that New York Health and Hospitals treats People of Color differently than their Caucasian counterparts."

37.     This testimony demonstrates that from the outset of her employment with HHC, Ms. Quarles was being discriminated against by being denied a position for which she was qualified, denied the salary for which she was qualified and further was cast to her immediate supervisor and other staff as an individual who did not want to work hard.  She was framed as a person who despite the qualifications for which she worked extremely hard, now just wants to ride out her remaining time and collect a check.  This discrimination was further amplified when less qualified Caucasian individuals were promoted ahead of Ms. Quarles, were paid more, and were provided support staff, all of which were denied to Ms. Quarles.

**COMPARATORS**

JJ BLITSTEIN

38.     On June 12, 2019, Ms. Quarles applied for three (3) Director of Labor Relations positions, two at Central Office (ID#50950 and ID#56268) and one at Elmhurst/Queens (ID#46043).

39.     Regarding the Director of Coler/Carter/Gouverneur/Seaview/McKinney, Defendant uses the fact that Ms. Quarles was at the time only employed by HHC four (4) months as the excuse to bypass Ms. Quarles in favor of a Caucasian male.  Respondents completely ignore the fact that Ms. Quarles came to HHC to be a Director of Labor Relations. That excuse overlooks Ms. Quarles' more than twenty-five (25) years of healthcare experience at the time of her hire by HHC and forces HHC to use wording such as "experience and overall interview process" making Mr. Blitstein and not Ms. Quarles the best fit for the position of Director.

40.     While the meaning of "overall interview process" may be ambiguous enough not to be classified as facial discrimination, Defendant fails to quantify Mr. Blitstein's experience. However, we do know that Ms. Quarles has more than twenty-five years in the field of health care labor relations, including time as the Director of Labor relations at Bronx Lebanon Hospital and Beth Abraham Nursing Home, now known as Center Light.

FREDERICK GARRITY

41.     On July 2, 2019, Ms. Quarles interviewed for the Director of Labor Relations position at Elmhurst/Queens Hospitals. The position was open from either March or April of 2019 and was previously filled by Caucasian male Marc Hanan.

42.     Here the Caucasian male who is given the Director position is Frederick Garrity. Defendants assert that Mr. Garrity's seventeen years of relevant experience as the reason he was chosen to be Director of Labor Relations at Elmhurst Hospital as opposed to Ms. Quarles.

43.     Defendants again fail to define what is meant by relevant experience and also fail to compare Mr. Garrity's experience with Ms. Quarles more than twenty five (25) years of relevant experience.

44.      Defendants also paid Mr. Garrity, a Caucasian male with no experience with HHC, $132,000.00 per year when the more qualified and current employee, Ms. Quarles is again denied the position of Director, and the salary that accompanies that position.  Defendants argue that because the city was in the throes of the pandemic, that it was not discriminatory to bring in a Caucasian male from another agency and train him for such a "voluminous" task while making him the highest paid Director in the agency and again bypassing the more qualified Black woman, Ms. Quarles.

45.      At the conclusion of her interview for this Director position, Ms. Quarles was again told that she would be given the opportunity to interview for other Director positions whenever they became open.

46.      Knowing that this location was closest to her home, Ms. Quarles was asked if she was indeed interested in those other locations.  Ms. Quarles informed the hiring panel that she would be willing to "go wherever the Director position was located."  Ms. Quarles was not promoted at that time.

SAMANTHA KENT

47.      In 2019, a Director of Labor Relations position became available at Central Office Labor Relations after the departure of Caucasian female, Brenda McIntyre.  On December 4, 2019, Ms. Quarles applied for the Director of Labor Relations position in the Central Office (ID#50950). Ms. Quarles was never even interviewed for this position. Instead, Mr. Wangel hired Samantha Kent, a Caucasian female, who previously worked with Mr. Wangel.  Ms. Quarles was not promoted at that time.

CONTINUED EMPLOYMENT

48.     On or around January and February of 2020, HHC announced a vacancy for the

Director of Labor Relations at Central Office because Samantha Kent vacated her position in order

to take another job opportunity.

49.     Beginning April 22, 2020, Ms. Quarles made several attempts to discuss the open

Director position in Central office with Mr. Wangel.  However, Mr. Wangel continuously cancelled

meetings with her for six months. The meeting dates that were scheduled and then cancelled with

Mr. Wangel were: 04/22/20, 06/05/20, 08/18/20, 08/19/20, 09/01/20, 09/14/20, 09/15/20, 10/20/20,

10/21/20 and 10/29/20.

50.     According to Defendant, Mr. Wangel was unwilling to have any discussions with Ms.

Quarles until he spoke with Ms. Kelly about Ms. Quarles performance.  Ms. Kelly resigned from

HHC on March 26, 2021 without Ms. Quarles ever having a meeting with Mr. Wangel regarding Ms.

Quarles capabilities to perform her current job, or how Ms. Quarles may fare with a promotion to

Director.

51.     Of significant importance, as testified by Ms. Quarles former immediate supervisor

Michelle Kelly, is that Ms. Kelly also made numerous attempts to meet with Mr. Wangel to discuss

Ms. Quarles.  Ms. Kelly states in relevant part:

> "15.     I was tasked by Jonathan Wangel, Assistant Vice President/Deputy
> Counsel, with developing a plan to identify where Ms. Quarles was "weak
> and needed assistance."  I found areas where Ms. Quarles would benefit
> from additional support, and developed a plan for improvement.  No one
> else was subjected to this type of analysis in searching for weaknesses and
> needs for assistance.
> 16.     Ms. Quarles quickly initiated her improvement in the identified
> areas through both self-study and with my assistance.
> 17.     I attempted to meet with Jonathan Wangel and Ms. Quarles several

times over more than a one (1) year time period to discuss Ms. Quarles
progress.  Each meeting request was either postponed, cancelled, or Mr.
Wangel failed to attend.  Therefore, even though he mandated that I keep
track of any weaknesses of Ms. Quarles, he was unaware that those claimed
identified weaknesses no longer remained.

18.     I came to think, and still think, that this exercise in documenting
weaknesses and area of need to improve was nothing more than a further
attempt to keep a Black Woman, in this case Ms. Quarles, from becoming
Director and receiving a salary properly commensurate with her position."

52.     Given that Mr. Wangel tasked Ms. Quarles immediate supervisor with the task of
monitoring her, it is difficult to imagine why, in good faith, Mr. Wangel would have such a difficult
time finding the time to talk to Ms. Kelly and MS. Quarles during the extensive amount of time Ms.
Kelly remained working for HHC.

53.     Defendants have falsely alleged that Michelle Kelly, Ms. Quarles immediate
supervisor, wanted to unload Ms. Quarles because Ms. Kelly was extremely dissatisfied with Ms.
Quarles work.  Defendants based this false allegation on am email from Andrea Chalika where she
wrote: "Lisa needs to function better independently, and Michelle as her supervisor and Regional
Director, cannot dump Lisa onto Central Office as part of the plan below."  Although we may never
know what exactly is meant by the plan below, even a cursory reading of the email in question
reveals that Michelle Kelly did not utter these words.  They are the thoughts and opinions of Andrea
Chilaka, not Ms. Quarles immediate supervisor and Regional Director Michelle Kelly.

54.     Furthermore, Michelle Kelly denies ever devising any such plan or expressing any
want to move Ms. Quarles, much less "dump her" on someone.

55.     Defendants state that the Central Office team is diverse while the two highest ranking
positions, Head of Labor Relations and Assistant Vice President, are filled by a Caucasian female
and Caucasian male, respectively.  Of all the Labor Relations Directors, half of the Caucasian male

14

directors were paid the top three (3) highest paid starting salaries of the eight (8) Labor Relations Directors. Meanwhile, two-thirds (2/3) of the African American Directors were paid at the lowest starting salary.

56.     The closer one gets to the top salaries and positions, the greater the disparity in pay and position for African-Americans when compared to their Caucasian counterparts. Here, Lisa Quarles is more than qualified for a position as Director of Labor Relations and would hold such a position with commensurate salary, but for the discriminatory practices of HHC against her. Ms. Quarles has suffered unlawful employment discrimination on the basis of race, color and/or national origin.  Ms. Quarles suffered and continues to suffer disparate treatment and a pattern of discriminatory behavior displayed in her place of employment.

57.     Ms. Quarles began her career with Defendants applying for a Director's position.  She was denied at her initial interview, and has been continually denied an earned promotion at every opportunity.  As noted by Defendants, there are varying criteria for promotion, all of which Ms. Quarles has surpassed.  As such, Lisa Quarles should have been promoted to Director of Labor Relations in at least one of the positions which were and continue to be open since her hire by HHC.

58.     Ms. Quarles submits herein that Defendants have failed to provide credible facts to support hiring Caucasian male JJ Blitstein instead of Ms. Quarles.   Ms. Quarles has more than twenty-five years in the field of health care labor relations, including time as the Director of Labor relations at Bronx Lebanon Hospital and Beth Abraham Nursing Home, now known as Center Light. Ms. Quarles was already employed by HHC and helping run the Labor Relations Department where Mr. Blitstein was brought in from outside HHC and needed to learn everything from scratch. However, Defendants cite to Mr. Blitstein's interview as that which made him the ideal candidate

15

for Director instead of Ms. Quarles. Mr. Blitstein was given the job as Director of Labor Relations despite the fact that Defendants do not provide any facts to support their contention that Mr. Blitstein was more worthy of the position than Ms. Quarles. As such, but for Ms. Quarles's race, there is no reason why JJ Blitstein was promoted to Director of Labor Relations over Ms. Quarles.

59.    Ms. Quarles has submitted herein that the experience of Frederick Garrity, a Caucasian male with no experience with HHC, yet the highest paid Director of Labor Relations, is in stark contrast and pales in comparison to Ms. Quarles's twenty five (25) years in health care labor relations.

60.    By Defendants' admission, Mr. Blitstein has almost a decade less relevant experience than Ms. Quarles. Nevertheless, he too was given the position of Director over Ms. Quarles while being less qualified than Ms. Quarles. Defendant again fails to define what is meant by relevant experience and also fails to contrast Mr. Garrity's experience with Ms. Quarles more than twenty five (25) years of relevant experience.

61.    Defendant attempts to justify paying Mr. Garrity $132,000.00 per year when the more qualified current African American employee, Ms. Quarles, is again turned down for the position of Director. Defendant alleges that because the city was in the throes of the pandemic, that it was not discriminatory to bring in a Caucasian male from another agency and train him for such a "voluminous" task while making him the highest paid Director in HHC and again bypassing the more qualified Ms. Quarles. As such, any excuses about how and why Ms. Quarles was and continues to be passed over are purely pretextual.

62.    Ms. Quarles has submitted herein that Samantha Kent, a Caucasian female, was granted the Director of Labor Relations position instead of Ms. Quarles due to Mr. Wangel having

16

a former working relationship with Ms. Kent.  Ms. Quarles was not offered the opportunity to interview for that position.

63.    Among the many factors omitted from Defendant's vague reasoning for the constant bypass of Ms. Quarles in an attempt to circumvent Defendant's discriminatory practices, is that Ms. Quarles applied for a Director of Labor Relations position in her initial application.  Her application remains on file and she has made no secret of the fact that she desires to be a Director.  She has offered to go to locations which are not close to her home and do what is necessary to secure the position.  Ms. Quarles credentials are unmatched by the Caucasian candidates who have been given the Director's position instead of her.  As such, but for Ms. Quarles's race, there is no reason why any of the Caucasian candidates were promoted to Director of Labor Relations over Ms. Quarles.

64.    After being unable to reach an agreement with HHC and retaining counsel to protect her rights, HHC, in retaliation became even more aggressive in their mistreatment of Ms. Quarles..

65.    Ms. Quarles every question is now turned against her as some form of deficiency in her work.  Communication with her supervisors ceased in many instances.  Ms. Quarles is often told to let the attorneys speak to each other, and receives no further answer to her query.  Even though her job performance is based upon effective communication, Defendants, in pure retaliatory fashion, have isolated Ms. Quarles and intensified their differential treatment of her.

66.    No Caucasian co-worker or applicant is treated in this manner.

67.    Ms. Quarles's exemplary record is more than sufficient to show that she was qualified for the position of Director of Labor Relations. Defendants argue that Ms. Quarles simply has no reason to raise the possibility of discrimination based upon her race, color, or national origin.  This is not only incorrect but the very arguments Defendant makes scream for an investigation into the

discriminatory employment practices of HHC.

## AS AND FOR A FIRST COUNT
## TITLE VII, CIVIL RIGHTS ACT of 1964, 42 U.S.C. § 2000e

68.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 67 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

69.    The Defendant HHC's Office  through their agents and employees, discriminated against the Plaintiff in her employment based on Plaintiff's race, color, and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

70.    As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of income.  Plaintiff suffered diminished employment, loss of income, loss of employment benefits and continues to suffer distress, humiliation, embarrassment, great financial expense and damage to her reputation.

71.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## AS AND FOR A SECOND COUNT
## 42 U.S.C. § 1981

72.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 71 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

73.    The above discriminatory pattern and practice based on race and color by Defendant HHC's Office through their agents and employees violates 42 U.S.C. §1981 as amended by the Civil

Rights Restoration Act of 1991 (Publ. Law No, 102-406).

74.    As a direct and proximate result of said acts, Plaintiff has suffered loss of employment and continues to suffer diminished employment, loss of income, loss of employment benefits, and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to her reputation.

75.    Because of Plaintiff's color she has been subjected to abuse and mistreatment as detailed above and has been treated differently than white individuals.

76.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

**AS AND FOR THE THIRD COUNT**
**42 U.S.C. §1983 - FOURTEENTH AMENDMENT**

77.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 76 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

78.    The Defendants Wangel and Cohen have engaged in actions and abuses which violate and deny Plaintiff her  rights as provided under the Fourteenth Amendment of the United States Constitution violating her Fourteenth Amendment rights of equal protection and substantive due process in discriminating against Plaintiff because of and account of her race, color and gender.

79.    Wangel and Cohen  infringement upon and violation of Plaintiff's rights protected under the Fourteenth Amendment of the United States Constitution was and is intended to place a

chilling effect upon the exercise of such rights by Plaintiff and other persons as is their right as provided by the U.S. Constitution and exercise such rights.

80.    Plaintiff, a Black woman, has been treated differently from similarly situated White employees and has been abused and violated because of her race, color and gender.

81.    Wangel and Cohen's acts has caused the Plaintiff to suffer and has resulted in diminishing her employment, loss of promotion, and the ability to advancement in his employment.

82.    Wangel and Cohen knew that they were discriminating against and violating Plaintiff's rights and agreed one with the other to so discriminate because of her race, color, and gender. In so acting, Defendant HHC's Office through their agents and employees, took actions in violation of Plaintiff's rights which they knew or should have known were within and outside the scope of their authority.

83.    Wangel and Cohen took no action to prevent the wrongful actions taken against Plaintiff to discriminate against her and cause her employment to be wrongfully diminished.

84.    Defendant HHC acquiesced and contributed to the continuation of the acts of Wangel and Cohen to violate Plaintiff's rights in failing to take action as to prevent and expose the discriminatory and violative actions being taken against Plaintiff.

85.    The Defendant HHC condoned the wrongful, discriminatory, reckless, careless and intentional acts taken as set out herein and each had an affirmative responsibility to prevent, expose and reverse said wrongful, discriminatory, reckless, careless and intentional acts but instead joined in this conspiracy against Plaintiff because of her race, color and gender.

86.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer diminished employment, loss of income, loss of employment benefits, and has suffered and

continues to suffer distress, humiliation, great expense, embarrassment, and damage to her reputation.

87.     As a result of Defendants' acts, Plaintiff suffered and is entitled to, damages sustained to date and continuing in excess of five million dollars ($5,000,000.00), as well as punitive damages, costs and attorney 's fees.

## AS AND FOR A FOURTH COUNT
## 42 U.S.C. §1983 - MUNICIPAL VIOLATIONS

88.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 87 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

89.     Defendant HHC's Office through its employees, agents, assigns, servants and in particular Wangel and Cohen acting under color of law, and through their employees servants, agents and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, in abusing the rights and discriminating against persons situated as Plaintiff is.  These actions have risen to the level of a pattern, practice, custom and/or usage which has deprived Plaintiff of rights, privileges and immunities secured by the Constitution and laws in violation of 42 U.S.C. §1983 to her as a Black woman.  These actions were condoned, adopted and fostered by policy makers of Defendants office.

90.     As a direct and proximate result of said acts, Plaintiff suffered and continues to suffer diminished employment, loss of income, loss of advancement in her career, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment, and damages to his reputation.

91.     As a result of Defendants' acts, Plaintiff suffered, and is entitled to, damages sustained to date and continuing in excess of five million dollars ($5,000,000.00), costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

### AS AND FOR A FIFTH COUNT
### NYS EXECUTIVE LAW §296

92.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 91 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

93.     The above discriminatory pattern and practice based on race, color, and gender by Defendant HHC's Office, their agents, and employees violates New York State.

94.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of status within her employment, suffer diminished employment, loss of income, loss of employment benefits in her career and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to her reputation.

95.     Because of Plaintiff's race, color, and gender she has been subjected to abuse and mistreatment as detailed above and has been treated differently than White individuals in that Plaintiff has been treated as stated herein because of her race, color,  and gender.

96.     As a result of Defendant's acts, Plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of five million dollars ($5,000,000.00) as well as punitive damages, costs and attorney's fees.

## AS AND FOR A FIFTH COUNT
## NEW YORK CITY HUMAN RIGHTS § 8-107

97.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 96 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

98.     The above discriminatory pattern and practice based on race, color, and gender by Defendant HHC's Office, their agents, and employees violates the New York City Human Rights Law § 8-107.

99.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of status within her employment, loss of income, loss of employment benefits, loss of advancement in her career and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to her reputation.

100.    Because of Plaintiff's race, color, and gender she has been subjected to abuse and mistreatment as detailed above and has been treated differently than White individuals in that Plaintiff has been treated as stated herein because of her race, color, and gender.

101.    As a result of Defendant's acts, Plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of five million dollars ($5,000,000.00) as well as punitive damages, costs and attorney's fees.

## PRAYER FOR RELIEF

Plaintiff requests judgment as follows:

a.      First Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b.      Second Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c.   Third Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.   Fourth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.   Fifth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

f.   Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k);

g.   A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

h.   Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

I.   An Order granting such other legal and equitable relief as the court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: Hempstead, New York
       January 13, 2022

LAW OFFICES OF
FREDERICK K. BREWINGTON

By:   _____
      ALBERT D. MANUEL
      *Attorneys for Plaintiff*
      556 Peninsula Boulevard
      Hempstead, New York  11550
      (516) 489-6959

24

c.   Third Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.   Fourth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.   Fifth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

f.   Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k);

g.   A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

h.   Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

I.   An Order granting such other legal and equitable relief as the court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: Hempstead, New York
       January 13, 2022

LAW OFFICES OF
FREDERICK A. BREWINGTON

By: _____
ALBERT D. MANUEL
*Attorneys for Plaintiff*
556 Peninsula Boulevard
Hempstead, New York  11550
(516) 489-6959

24